UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**D. AND D. MOUNTAIN AIR CLEANERS, INC.,**

 **Plaintiff,**

**vs.**           **No.  21-CV-00802 WJ/GJF**

**AMCO INSURANCE COMPANY, a NATIONWIDE
COMPANY, and LIBERTY MUTUAL INSURANCE
COMPANY/THE OHIO CASUALTY GROUP, UNITED
STATES FIDELITY AND GUARANTY COMPANY,
THE NORTHERN INSURANCE COMPANY OF NEW
YORK/ZURICH, and ARGONAUT INSURANCE COMPANY,**

 **Defendants.**

**<u>SECOND AMENDED COMPLAINT FOR BREACH OF CONTRACT,
VIOLATIONS OF THE NEW MEXICO INSURANCE PRACTICES ACT,
BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING,
AND FOR DECLARATORY JUDGMENT</u>**

For its Complaint against defendants AMCO Insurance Company, a Nationwide Company ("AMCO"), Liberty Mutual Insurance Company/The Ohio Casualty Group ("Liberty Mutual"), United States Fidelity and Guaranty Company ("USF&G"), The Northern Insurance Company of New York/Zurich Insurance Group ("Zurich"), and Argonaut Insurance Company ("Argonaut") (referred to collectively as the "Insurers"), Plaintiff D. and D. Mountain Air Cleaners, Inc. ("D&D") states the following:

**<u>Parties, Jurisdiction and Venue</u>**

1.  D&D is a domestic New Mexico corporation duly organized under the laws of the State of New Mexico, with its principal place of business at 157 Central Park Sq., Los Alamos, New Mexico, 87544.  D&D operates a dry-cleaning service located at 309 Paseo De Onate, Espanola, New Mexico, 87532 ("the D&D Site").

2.     Upon information and belief, defendant AMCO is a foreign corporation organized and existing under the laws of the State of Iowa and authorized to conduct business in the State of New Mexico under the New Mexico Insurance Code.  AMCO regularly transacts business in New Mexico through the sale of insurance policies and derives substantial economic benefit from the sales of those policies in New Mexico.  Accordingly, AMCO is subject to personal jurisdiction in the State of New Mexico.

3.     Upon information and belief, defendant Liberty Mutual is a foreign corporation organized under the laws of the State of Massachusetts and authorized to conduct business in the State of New Mexico under the New Mexico Insurance Code.  Liberty Mutual regularly transacts business in New Mexico through the sale of insurance policies and derives substantial economic benefit from the sale of those policies.  Accordingly, Liberty Mutual is subject to personal jurisdiction in the State of New Mexico.

4.     Upon information and belief, defendant USF&G is a foreign domestic corporation organized under the laws of the State of Maryland and is authorized to conduct business in the State of New Mexico under the New Mexico Insurance Code.   USF&G regularly transacts business in New Mexico through the sale of insurance policies and derives substantial economic benefit from the sale of those policies.  Accordingly, USF&G is subject to personal jurisdiction in the State of New Mexico.

5.     Upon information and belief, defendant Zurich is a foreign corporation organized under the laws of the State of Illinois and authorized to conduct business in the State of New Mexico under the New Mexico Insurance Code.  Zurich regularly transacts business in New Mexico through the sale of insurance policies and derives substantial economic benefit from the

sale of those policies.  Accordingly, Zurich is subject to personal jurisdiction in the State of New Mexico.

6.     Upon information and belief, defendant Argonaut Insurance Company ("Argonaut") is a foreign corporation organized under the laws of the State of Illinois and authorized to conduct business in the State of New Mexico under the New Mexico Insurance Code. Argonaut regularly transacts business in New Mexico through the sale of insurance policies and derives substantial economic benefit from the sale of those policies.  Accordingly, Argonaut is subject to personal jurisdiction in the State of New Mexico.

7.     Pursuant to 28 U.S.C. § 1332, the Court has subject matter jurisdiction because D&D, AMCO, Liberty Mutual, USF&G, Zurich and Argonaut are all citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds Seventy-Five Thousand Dollars ($75,000.00).

8.     Venue is proper in the United States District Court for the District of New Mexico pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claims asserted by D&D arose in this Judicial District.

**Facts Common to All Counts and Applicable Policies of Insurance**

9.     In January 1999, the United States Environmental Protection Agency ("U.S. EPA") listed the North Railroad Avenue Plume ("NRAP") Superfund site on the EPA National Priorities List in response to a release of tetrachloroethene ("PCE") from a laundromat facility located in Espanola, New Mexico that is not affiliated with D&D.

10.    The U.S. EPA and the New Mexico Environment Department ("NMED") Superfund Oversight Section ("SOS") conducted additional investigations from 2017 to 2019 east

of the NRAP due to increasing concentrations of chlorinated volatile compounds ("CVOCs") in the easternmost groundwater monitoring wells following activities associated with remediation of the NRAP Superfund site.  Based on soil gas surveys and shallow aquifer monitoring, the NMED alleged that a release of CVOCs also had occurred at the D&D Site.  Subsequent to these investigations, the SOS asserted that PCE and trichloroethene ("TCE") groundwater contamination identified beyond the eastern extent of the NRAP was attributable to D&D.

11.     On May 21, 2020, the New Mexico Hazardous Waste Bureau ("HWB")  sent a Request for Information Letter ("RFI-1") to D&D requesting documents related to the purchase and disposal of hazardous and solid wastes at the D&D Site.  D&D provided the information in their possession in response to the RFI-1.

12.     The HWB send a second Request for Information Letter ("RFI-2") to D&D on June 30, 2020 requesting clarification regarding whether D&D had produced all the requested documents in its possession.  In response to the RFI-2, D&D produced additional documentation that it received from a third party.

13.     Based on the HWB's interpretation of the documents submitted by D&D, and based on the additional findings of the SOS investigation attributing PCE and TCE groundwater contamination to the dry-cleaning operations at the D&D Site, HWB issued an Administrative Compliance Order ("Compliance Order") on November 19, 2020, directing D&D to take corrective actions and assessing a civil penalty of $56,000.00 against D&D for violations of the administrative regulations governing the disposal of hazardous waste.  In addition, accompanying the Compliance Order was a directive from the NMED Ground Water Quality Bureau ("GWQB") requiring D&D to submit a Stage 1 Abatement Plan or an application for a Voluntary Remediation

4

Program to remediate the PCE and TCE groundwater contamination identified during the SOS investigation of the eastern side of the NRAP site.

14.     D&D tendered claims to all Insurers for indemnity and defense benefits, covering the NMED's demand for a Stage 1 Abatement Plan or an application for Voluntary Remediation, to which D&D was entitled under the policies of insurance issued by the Insurers.

15.     D&D engaged Daniel B. Stephens & Associates, Inc. ("DBS&A) to prepare and implement a Stage 1 Abatement Plan in compliance with the NMED's directive.  On July 16, 2021, the NMED accepted DBS&A's proposed State 1 Abatement Plan, with additional amendments.

## AMCO Policies and Improper Denial of Coverage

16.     AMCO issued Premier Businessowners Policies to D&D for the period effective 2008 through the present date.

17.     As noted above, in December 2020, D&D tendered a notice of claim for benefits under the AMCO policies for costs associated with the NMED's directive to abate and remediate the D&D Site.

18.     On December 18, 2020, AMCO denied coverage. As the basis for its denial of D&D's claim for indemnity benefits under the AMCO Policies, AMCO claimed that coverage was precluded because the civil penalties and compliance requirements imposed by the NMED were not "bodily injury" or "property damage" caused by an "occurrence", as those terms were defined in the AMCO Policies.

19.     The AMCO denial letter did not acknowledge, much less analyze, the separate pollution removal coverage to which D&D was entitled under the AMCO Policies.  Specifically, the AMCO Policies contained the following provision:

**Pollutant Clean Up and Removal**

(1) We will pay your expense to extract "pollutants" from land, water or Covered Property at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

(2) This pollutant Clean Up and Removal Additional Coverage does not apply to:

(a) Costs to test for, monitor or assess the existence, concentration or effects of "pollutants"; or

(b) Any penalties or assessments that may be charged against you due to any statute, regulation or ordinance.
But we will pay for testing which is performed in the course of extracting the "pollutants" from land or water.

(3) The most we will pay for each location under this Pollutant Clean Up and Removal Additional Coverage is $25,000 for the sum of all such expenses arising out of Covered Causes of Loss occurring during each separate 12 month period of this policy.

(4) The limit for this Pollutant Clean Up And Removal Additional Coverage is in addition to the Limits of Insurance. Section A (5)(i),(1)-(2) at 38.

*See* Premier Business Owners Property Coverage Form at 8 (policy # ACP BPS 7213351319)

20.     Despite the Pollution Clean Up and Removal coverage, which plainly covers the preparation and implementation of the DBS&A Stage 1 Abatement Plan and other remedial tasks, as required by the NMED directive, AMCO has nonetheless denied D&D these indemnity benefits.

21.     As a result of AMCO's unreasonable and unjustifiable refusal to provide indemnity and defense benefits, D&D was constrained to file this suit.

**Liberty Mutual's Policies and Improper Denial of Coverage**

22.     For successive periods from 5/1/1994 to 5/1/2003, Liberty Mutual issued to D&D Commercial Package Policies ("CPP"), including a Commercial General Liability ("CGL") coverage part.

23.     After receiving D&D's tender of claim for indemnity benefits under the Liberty Mutual Policies in December 2020, Liberty Mutual denied coverage on January 8, 2021.  Liberty Mutual's denial of coverage was based on the so-called "Pollution Exclusion", which precludes coverage for any loss arising out of a request to clean up pollutants and based its assessment that the civil penalty does not constitute bodily injury or property damage.

24.     The January 8, 2021 denial of coverage did not acknowledge, much less address, the Pollutant Clean Up and Removal endorsement attached to the Liberty Mutual Policies, which provided as follows:

> **Pollutant Clean Up and Removal**
>
> We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.
>
> This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants." But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.
>
> The most we will pay under this Additional Coverage for each described premises is [sic] $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12 month period of this policy.

*See* Building and Personal Property Coverage Form (policy # CP 00100695)

25.     In addition, the Liberty Mutual Policies contained the following endorsement:

> **Systems Breakdown Endorsement.**
> **Hazardous materials coverage.**
>
> We will pay up to $25,000 for any additional expenses you incur for:
>
>> (1) cleanup;
>> (2) repair or replacement; or
>> (3) disposal;
>
> of Covered Property which is damaged, contaminated or polluted as a result of an "accident" by a substance declared by a governmental agency to be hazardous to health. This limitation does not apply to damage, contamination or pollution caused by ammonia. See Systems Breakdown Endorsement, 73.

26.     Despite the Pollution Clean Up and Removal coverage and the Hazardous materials coverage, which plainly cover the preparation and implementation of the DBS&A Stage 1 Abatement Plan and other remedial tasks, as required by the NMED directive, Liberty Mutual has nonetheless denied D&D these indemnity benefits.

27.     As a result of Liberty Mutual's unreasonable and unjustifiable refusal to provide indemnity and defense benefits and defense costs, D&D was constrained to file this suit.

**USF&G Policies and Improper Denial of Coverage**

28.     Upon information and belief, between 2006 and 2008, USF&G issued to D&D Commercial Property Policies ("CPP"), including a Commercial General Liability ("CGL") coverage part.

29.     After receiving D&D's tender of claim for indemnity benefits under the USF&G policies in May 2021, USF&G has yet to acknowledge coverage.

30.     Upon information and belief, the USF&G policies contained a Pollutant Clean Up
and Removal endorsement attached to the USF&G policies, which provided as follows:

**Pollutant Clean Up and Removal**

We will pay your expense to extract "pollutants" from land
or water at the described premises if the discharge, dispersal,
seepage, migration, release or escape of the "pollutants" is
caused by or results from a Covered Cause of Loss that occurs
during the policy period. The expenses will be paid only if they
are reported to us in writing within 180 days of the date on which
the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for,
monitor or assess the existence, concentration or effects of
"pollutants." But we will pay for testing which is performed in
the course of extracting the "pollutants" from the land or water.

The most we will pay for each location under this Additional
Coverage is the limit shown in Declarations for the sum of all
such expenses arising out of Covered Causes of Loss occurring
during each separate 12 month period of this policy.

31.     In addition, upon information and belief, the USF&G  policies contained the
following endorsement:

**Systems Breakdown Endorsement.**
**Hazardous materials coverage.**

We will pay for loss or damage caused by or resulting from risks of
direct physical loss due to

(1)     Mechanical breakdown, including rupture or
bursting caused by centrifugal force.

(2)     Artificially generated electric current,
including  electric arcing, that disturbs
electrical devices and appliances.

But this additional coverage does not apply to the following types
of property:

9

Steam pipes, steam engines, steam turbines, including their accessories and components

We will pay up to $25,000 for any additional expenses you incur for:
     (1) Cleanup;
     (2) Repair or Replacement; or
     (3) Disposal

of Covered Property which is damaged, contaminated or polluted as a result of an "accident" by a substance declared by a governmental agency to be hazardous to health. This limitation does not apply to damage, contamination or pollution caused by ammonia.

32.    Despite the Pollution Clean Up and Removal coverage and the Hazardous materials coverage, which plainly cover the preparation and implementation of the DBS&A Stage 1 Abatement Plan and other remedial tasks, as required by the NMED directive, USF&G has nonetheless refused to provide D&D these indemnity benefits.

33.    As a result of USF&G's unreasonable and unjustifiable refusal to provide indemnity and defense benefits and defense costs, D&D was constrained to file this suit.

**Zurich's Policy and Improper Denial of Coverage**

34.    Between 5/1/2003 to 5/1/2004, Zurich issued to a D&D Commercial Property Policy ("CPP"), including a Commercial General Liability ("CGL") coverage part.

35.    After receiving D&D's tender of claim for indemnity benefits under the Zurich Policy in May 2021, Zurich denied coverage.  Zurich's denial of coverage was based on the so-called "Pollution Exclusion", which precludes coverage for any loss arising out of a request to clean up pollutants and based its assessment that the civil penalty does not constitute bodily injury or property damage.

10

36.     Zurich denied coverage despite the Pollutant Clean Up and Removal endorsement

attached to the Zurich policy, which provided as follows:

**Pollutant Clean Up and Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants." But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay for each location under this Additional Coverage is the limit shown in Declarations for the sum of all such expenses arising out of Covered Causes of Loss occurring during each separate 12 month period of this policy.

*See* Building and Personal Property Coverage Form (policy # PAS 42123381).

37.     In addition, the Zurich policy contained the following endorsement:

**Systems Breakdown Endorsement.**
**Hazardous materials coverage.**

We will pay for loss or damage caused by or resulting from risks of direct physical loss due to

> (1)     Mechanical breakdown, including rupture or bursting caused by centrifugal force.

> (2)     Artificially generated electric current, including  electric arcing, that disturbs electrical devices and appliances.

But this additional coverage does not apply to the following types of property:

11

Steam pipes, steam engines, steam turbines, including their accessories and components

We will pay up to $25,000 for any additional expenses you incur for:
> (1) Cleanup;
> (2) Repair or Replacement; or
> (3) Disposal

of Covered Property which is damaged, contaminated or polluted as a result of an "accident" by a substance declared by a governmental agency to be hazardous to health. This limitation does not apply to damage, contamination or pollution caused by ammonia.

38.     Despite the Pollution Clean Up and Removal coverage and the Hazardous materials coverage, which plainly cover the preparation and implementation of the DBS&A Stage 1 Abatement Plan and other remedial tasks, as required by the NMED directive, Zurich has nonetheless denied D&D these indemnity benefits.

39.     Most significantly, counsel for D&D specifically requested that Zurich review the terms of the policy to determine whether the policy contained the pollution cleanup coverage. Zurich continued to deny coverage and claimed that the policy did not contain the pollution cleanup coverage.

40.     As a result of Zurich's unreasonable and unjustifiable refusal to provide indemnity and defense benefits and defense costs, D&D was constrained to file this suit.

**Argonaut's Policy and Improper Denial of Coverage**

41.     Upon information and belief, between 2005 and 2006, Argonaut issued to D&D a Commercial Property Policy ("CPP"), including a Commercial General Liability ("CGL") coverage part.

42.     After receiving D&D's tender of claim for indemnity benefits under the Argonaut policy, Argonaut denied coverage.  Upon information and belief, denial of coverage was based on the so-called "Pollution Exclusion, which precludes coverage for any loss arising out of a request to clean up pollutants and based its assessment that the civil penalty does not constitute bodily injury or property damage.

43.     Although D&D has requested a copy of the Argonaut policy, Argonaut has not made the policy available to D&D, its insured.  Upon information and belief, the Argonaut policy included Pollutant Clean Up and Removal coverage, which provided as follows:

**Pollutant Clean Up and Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants." But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay for each location under this Additional Coverage is the limit shown in Declarations for the sum of all such expenses arising out of Covered Causes of Loss occurring during each separate 12 month period of this policy.

44.     In addition, upon information and belief, the Argonaut policy contained the following endorsement:

**Systems Breakdown Endorsement.**
**Hazardous materials coverage.**

We will pay for loss or damage caused by or resulting from risks of direct physical loss due to

      (1)      Mechanical breakdown, including rupture or bursting caused by centrifugal force.

      (2)      Artificially generated electric current, including electric arcing, that disturbs electrical devices and appliances.

But this additional coverage does not apply to the following types of property:

Steam pipes, steam engines, steam turbines, including their accessories and components

We will pay up to $25,000 for any additional expenses you incur for:
      (1) Cleanup;
      (2) Repair or Replacement; or
      (3) Disposal

of Covered Property which is damaged, contaminated or polluted as a result of an "accident" by a substance declared by a governmental agency to be hazardous to health. This limitation does not apply to damage, contamination or pollution caused by ammonia.

45.     Despite the Pollution Clean Up and Removal coverage and the Hazardous materials coverage, which plainly cover the preparation and implementation of the DBS&A Stage 1 Abatement Plan and other remedial tasks, as required by the NMED directive, Argonaut has nonetheless denied D&D these indemnity benefits.

46.     As a result of Argonaut's unreasonable and unjustifiable refusal to provide indemnity and defense benefits and defense costs, D&D was constrained to file this suit.

**COUNT I**
**Breach of Contract**
**(Against All Insurers)**

47.     D&D reasserts and incorporates by reference the allegations in paragraphs 1 through 46 the same as if fully set forth.

48.     Each of the above-referenced policies constitutes a legal and enforceable contract.

49.     Under the terms of the referenced policies, the Insurers each agreed to indemnify D&D for pollution clean-up and removal, subject to policy terms and conditions.

50.     D&D has incurred costs in response to the NMED's directive.

51.     D&D has made a timely demand for benefits under the applicable policies of insurance.

52.     Each of the Insurers is liable to D&D for pollution clean-up and removal costs under the terms of the policies of insurance.

53.     Each of the Insurers has breached the insurance contract by failing to pay indemnity and defense benefits to which they are contractually obligated to pay under the policies.

54.     Each of the Insurers has further breached its policy obligations to fairly investigate the claims made against D&D by refusing to identify and acknowledge the pollution clean-up and removal endorsements to the policies of insurance.

55.     D&D has been damaged in the amount it has expended to comply with the NMED directive and also by the costs and fees incurred to prosecute the present action.

56.     Each of the Insurers has unreasonably failed to pay D&D's clean up under the policies of insurance and D&D is therefore entitled to an award of reasonable attorneys' fees and costs under NMSA 1978, § 39-2-1.

15

WHEREFORE, D&D requests judgment on Count I as follows:

A.     Compensatory damages in an amount to be proven at trial for investigation and remedial costs;

B.     Reasonable attorneys' fees and costs as provided by statute;

C.     Pre-judgment and post-judgment interest to the fullest extent allowed by law; and

D.     Such other relief the Court deems just and proper.

### COUNT II
### Unfair Insurance Practices
### (Against AMCO, Liberty Mutual, USF&G, and Zurich)

57.     D&D reasserts and incorporates by reference the allegations in paragraphs 1 through 56 the same as if fully set forth.

58.     In refusing to acknowledge their duty to indemnify, AMCO, Liberty Mutual, USF&G, and Zurich have engaged in an unfair claim practice as defined in NMSA 1978, Section 59A-16-3.

59.     Specifically, AMCO, Liberty Mutual, USF&G, and Zurich have misrepresented to D&D pertinent facts or policy provisions relating to coverages at issue by willfully and/or recklessly failing to acknowledge and address the policy endorsements for pollution clean-up and removal coverage in violation of NMSA 1978, Section 59A-16-20(A).

60.     AMCO, Liberty Mutual, USF&G, and Zurich have further willfully and/or recklessly failed to implement reasonable standards for the prompt investigation and processing of D&D's claim for indemnity benefits by refusing to acknowledge that D&D is entitled to the indemnity benefits under the policies of insurance.

61.     AMCO, Liberty Mutual, USF&G, and Zurich willfully have not attempted in good faith to effectuate a prompt and fair settlement of D&D's claim, despite reasonably clear evidence of liability where the pollution clean-up and removal provisions of the policies of insurance cover D&D's response to the NMED's directive.

62.     AMCO, Liberty Mutual, USF&G, and Zurich have failed to give at least equal regard to D&D's interests in securing its rights under the insurance policies as they did to their own interests in attempting to avoid the expense of complying with their coverage obligations.

63.     AMCO, Liberty Mutual, USF&G, and Zurich's unreasonable course of conduct with respect to D&D's claims represents corporate policies and practices to ignore their obligations under the insurance policies and force insureds, like D&D, into litigation to vindicate their rights to insurance coverage.

64.     AMCO, Liberty Mutual, USF&G, and Zurich's unreasonable course of conduct, including manufacturing legally and factually untenable bases for denial of coverage, was knowingly and willfully calculated to frustrate the agreed upon purposes of the insurance policies.

65.     AMCO, Liberty Mutual, USF&G, and Zurich's unreasonable course of conduct, including failing to ascertain the applicable provisions of the policies of insurance, including the applicable endorsements, was knowingly and willfully calculated to prevent D&D from obtaining the indemnity benefits for which D&D bargained in obtaining the insurance policies from the Insurers.

66.     These acts, along with other acts committed by AMCO, Liberty Mutual, USF&G, and Zurich, constitute unfair insurance practices.

67.     D&D has incurred actual damages as a proximate result of AMCO, Liberty Mutual, USF&G, and Zurich's bad faith insurance practices in amounts to be proven at trial.

68.     Based on AMCO, Liberty Mutual, USF&G, and Zurich's willful and malicious acts in refusing to honor their obligations to provide D&D indemnity and defense benefits under the insurance policies, D&D is entitled to an award of punitive damages.

WHEREFORE, D&D requests judgment on Count II as follows:

A.      Actual damages to D&D, in an amount to be proven at trial;

B.      Attorneys' fees incurred to prosecute this action and to attempt to voluntarily obtain AMCO, Liberty Mutual, USF&G, and Zurich's commitment to pay indemnity and defense benefits, as provided by NMSA 1978, Section 59A-16-30;

C.      An award of punitive damages against AMCO, Liberty Mutual, USF&G, and Zurich for their willful and malicious denial of the indemnity and defense benefits to which D&D is entitled;

D.      Pre-judgment and post-judgment interest to the fullest extent allowed by law; and

E.      Such other relief the Court deems just and proper.

## COUNT III
## Breach of the Covenant of Good Faith and Fair Dealing
### (Against All Insurers)

69.     D&D reasserts and incorporates by reference the allegations in paragraphs 1 through 68 the same as if fully set forth.

70.     Each Insurer has been provided with information sufficient to determine its duty to indemnify D&D under the circumstances.

71.     The Insurers have not acted honestly nor in good faith in the performance of their respective duties under the applicable policies.

72.     No Insurer has acted reasonably under the circumstances by conducting a timely investigation and a fair evaluation of its duty to provide indemnity and defense benefits to D&D.

73.     The Insurers have failed to give at least equal regard to D&D's interests in securing D&D's rights under the above-referenced policies as they did to secure their interests in attempting to avoid the expense of complying with their coverage obligations.

74.     The Insurers' actions represent corporate policies and practices that ignore their obligations under policies and force D&D and other similarly situated insureds to initiate court proceedings merely to vindicate their contractual rights to insurance coverage.

75.     The Insurers' actions have been and are knowingly and willfully calculated to frustrate the agreed upon purpose of the above-referenced policies, including the applicable endorsements, and to injure D&D's right to receive the benefits of the policies in order to further the economic interests of the Insurers by avoiding their obligations to indemnify D&D.

76.     D&D has been injured because it has been required to expend resources responding to each Insurer's inquiries and by the costs and fees required to prosecute this action.

77.     The actions of the Insurers are reckless, based on dishonest judgment, malicious, willful, and wanton, such that the imposition of punitive damages is justified.

WHEREFORE, D&D requests judgment on Count III as follows:

A.      An award of actual damages in an amount to be proven at trial;

B.      An award of attorneys' fees necessary to prosecute this action;

C.      An award of punitive damages sufficient to deter the Insurers from engaging in similar conduct in the future;

D.      Pre-judgment and post-judgment interest to the fullest extent allowed by law; and

E.      Such other relief the Court deems just and proper.

## COUNT IV
## Declaratory Judgment– 42 U.S.C. § 2201

78.     D&D reasserts and incorporates by reference the allegations in paragraphs 1 through 77 the same as if fully set forth.

79.     An actual controversy exists regarding whether the NMED's directive triggered the Insurers' duties to indemnify and provide defense benefits under the above-referenced policies.

80.     An actual controversy exists regarding each Insurer's duty to indemnify and provide defense benefits under the above-referenced policies.

WHEREFORE, D&D requests judgment on Count IV as follows:

A.      Declaring that the NMED's directive triggered the Insurers' duties to fully indemnify D&D as set forth in the policies of insurance;

B.      Declaring that each Insurer is obligated to reimburse and/or pay for all clean up and removal costs incurred by D&D;

C.      Declaring that each Insurer is obligated to pay for D&D's reasonable costs of defending against the NMED's claims; and

D.      Such other relief the Court deems just and proper.

## Jury Trial Demand

D&D hereby demands a trial by jury on all counts so triable.

Respectfully submitted,

HINKLE SHANOR LLP

*/s/ Thomas M. Hnasko*
Thomas M. Hnasko
Julie A. Sakura
Post Office Box 2068
Santa Fe, NM 87504-2068
(505) 982-4554
thnasko@hinklelawfirm.com
jsakura@hinklelawfirm.com

*Attorneys for Plaintiff D. and D. Mountain Air Cleaners*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 3rd day of March, 2022, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Meena H. Allen
Ashley J. Cook
ALLEN LAW FIRM, LLC
6121 Indian School Road, NE, Suite 230
Albuquerque, NM  87110
505-298-9400
mallen@mallen-law.com
*Attorneys for Defendant/Counter-Plaintiff The Ohio Casualty Insurance Company and West American Insurance Company*

Juan L. Flores
Jaime L. Dawes
STELZNER, WINTER, WARBURTON, FLORES & DAWES, P.A.
Post Office Box 528
Albuquerque, NM  87103
505-938-7770
jflores@stelznerlaw.com
jd@stelznerlaw.com
*Attorneys for Defendant AMCO Insurance Co.*

Jason Irvin
GORDON REES SCULLY MANSUKHANI
500 Marquette Avenue, Ste. 1200
Albuquerque, NMN 87102
(505) 988-9008
jirvin@grsm.com
*Attorneys for United States Fidelity & Guaranty Company*

Sean E. Garrett
YLAW, P.C.
4908 Alameda Blvd., NE
Albuquerque, NM 87113
(505) 266-3995
sgarrett@ylawfirm.com
*Attorneys for Argonaut Insurance Company*

*/s/ Thomas M. Hnasko*
Thomas M. Hnasko